## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SORA ARERO**,<br><br>    Plaintiff,<br><br>    v.<br><br>**KARI LAKE**,<br><br>    Defendant. | Case No. 1:22-cv-1663 (TNM) |

## <u>MEMORANDUM OPINION</u>

The United States Agency for Global Media fired Soro Arero, a reporter, while he was serving a one-year probationary employment period. Arero then sued the head of the Agency for discrimination based on his ethnicity, retaliation, and creating a hostile work environment.[1] The Agency's motion for summary judgment is now before this Court.

The Court holds that no reasonable jury could find in Arero's favor on any of his claims. The Agency has offered a legitimate, nondiscriminatory, and nonretaliatory reason for its decision to terminate Arero. And Arero has not proffered evidence undermining that reason. The record also lacks evidence from which a reasonable jury could find a hostile work environment. The Court will therefore grant the Agency's motion.

## I.

The U.S. Agency for Global Media broadcasts news and information in 63 languages, endeavoring to provide reliable, objective and balanced news especially in countries that lack a

---

[1] Arero's Complaint names Amanda Bennett, in her official capacity as the Acting Chief Executive Officer for the U.S. Agency for Global Media, as Defendant. Am. Compl. at 1, ECF No. 25. Kari Lake, the current Acting CEO of the Agency, has been substituted as Defendant under Federal Rule of Civil Procedure 25(d).

free press.  Pl.'s Resp. to Def.'s Stat. of Mat. Facts ("Pl.'s Resp. to DSMF") ¶¶ 1–3, ECF No. 75.[2]  The Agency accomplishes that mission by overseeing several federal broadcast outlets, including Voice of America ("VOA").  Pl.'s Resp. to DSMF ¶ 1.  VOA serves the interests of the United States by broadcasting directly to "the peoples of the world" "consistently reliable and authoritative" news.  Def.'s Ex. 1 at 2, ECF No. 72-2.

Through its Africa Division, VOA produces digital, radio, and television content each week for more than 70 million Africans.  *See* Def.'s Ex. 17, ECF No. 72-18; Pl.'s Ex. 123 at 255, ECF No. 75-1.  The Africa Division is separated into ten services, including the Horn of Africa Service.  Def.'s Ex. 16 ("Mengesha Dep.") at 31:19–20, ECF No. 72-17.  That Service broadcasts to listeners in Ethiopia and Eritrea in three languages:  Afaan Oromo ("Oromo"), Tigrinya, and Amharic.  Def.'s Ex. 12 ("Lippman Dep.") at 24:18–20, 25:2–4, ECF No. 72-13; Am. Compl. ¶ 2, ECF No. 25.  Each language is also associated with an ethno-linguistic group in Ethiopia.  Pl.'s Opp'n to Summ. J. ("Pl.'s Opp'n") at 2, ECF No. 75.

"[E]thnic relations in Ethiopia are complicated."  Def.'s Ex. 22 ("Wayessa Dep. 1") at 39:8–10, ECF No. 72-23.  Ethiopia's history includes a period of pro-Amhara "ethnic domination" against Oromos.  Def.'s Opp'n to Pl.'s Further Stat. of Mat. Facts ("Def.'s Opp'n to FSMF") ¶ 157, ECF No. 77-2.  The Amhara language remains the lingua franca of the Ethiopian government and many Ethiopians learned it in school due to the government's language policies.

---

[2]  The Court draws its facts from the parties' statements of material facts and their exhibits.  The Court acknowledges that Arero purport to dispute numerous facts here but observes that many of those disputes are not genuine and material.  *See, e.g.*, Pl.'s Resp. to DSMF ¶ 85 (disputing as a "mischaracterization of evidence" an email because it contained a single miscapitalization and omitted the sender's initials).  When citing exhibits, the Court uses the pagination generated by the CM/ECF system.

Lippman Dep. at 32:5–12; Mengesha Dep. at 50:3–16; Def.'s Ex. 21 ("Geme Dep.") at 13:9–14:2, ECF No. 72-22.

VOA's Horn of Africa Service devotes the most airtime to Amharic language programs because Amharic is "the language of the entire country" of Ethiopia. Lippman Dep. at 32:5–12; Mengesha Dep. at 164:8–10. The Service began broadcasting in Amhara and later added its Tigrinya and Oromo language services. Mengesha Dep. at 164:8–12. Although the Horn of Africa's programs are broadcast separately in these different languages, VOA seeks to ensure that programs broadcast in different languages take "the same editorial point of view." *Id.* at 97:9–17. Reporters are hired into particular language services and are typically native speakers of the language for which they are hired. Lippman Dep. at 97:1–2. Many Horn of Africa reporters speak multiple languages but are often members of the ethnic group associated with the language service for which they work. *See, e.g.*, Pl.'s Resp. to DSMF ¶ 34; Mengesha Dep. at 49:1–21. Plaintiff Soro Arero was no exception. He is an Ethiopian native and member of the Oromo ethnic group who worked as an Oromo language reporter for more than a decade. *See* Pl.'s Resp. to DSMF ¶ 8; Am. Compl. ¶ 1.

Arero began his career with the Agency as a contractor. *See, e.g.*, Pl.'s Resp. to DSMF ¶ 9; Def.'s Ex. 3 ("Arero Dep.") at 25:9–16, 59:8–60:8, ECF No. 72-4. William Marsh, then-chief of the Horn of Africa Service, repeatedly praised Arero's work to the director of the Africa Service, Negussie Mengesha. *See, e.g.*, Def.'s Opp'n to FSMF ¶¶ 140, 141. When a full-time employee position as an Oromo language broadcaster became available, Arero applied for it. Pl.'s Resp. to DSMF ¶ 14. With Marsh's support, Arero was selected for the position over other candidates in January 2020. *Id.* ¶ 19. Arero's job as remained essentially the same upon his promotion to full-time employment. Def.'s Opp'n to FSMF ¶ 145. Arero wrote stories, emceed

programs, served as a "web host," and acted as a field reporter.  Def.'s Ex. 52 at 9.  His hiring

letter, which was signed by Mengesha, specified that Arero would be subject to a one-year

probationary period.  Def.'s Ex. 13 at 2, ECF No. 72-14.

Arero never completed his probationary period.  He was fired days before it ended.  Pl.'s

Resp. to DSMF ¶ 23.  The year before Arero's termination was eventful.  The COVID pandemic

sent workers home and protests in Ethiopia during the summer of 2020 provided fodder for news

coverage and stoked tensions within the Agency.  During those same months, the Agency

documented three problems with Arero's performance.  The first problem was behavioral.  The

second two concerned Arero's work product.

Dhaba Wayessa, an editor for the Oromo service and Arero's "daily supervisor," filed the

first documented complaint about Arero's performance in April 2020.  Pl.'s Resp. to DSMF

¶ 39; Arero Dep. at 60:7–8; Wayessa Dep. 1 at 73:4–12, 66:4–8.  Wayessa wrote to his

supervisor, Tzitzia Belachew, the managing editor and acting chief of the Horn of Africa, to

report that Arero was not completing work and had been insubordinate.  Pl.'s Resp. to DSMF

¶ 39; Def.'s Ex. 23 at 2, ECF No. 72-24.  Part of the issue was technology.  Like many people

called on to telework during the pandemic, Arero had difficulties working from home.  *Id.*

Those issues ultimately improved.  Wayessa Dep. 1 at 273:9–17; Ex. 27 at 4, ECF No. 72-28.

Wayessa also reported interpersonal difficulties.  He told Belachew that Arero "thinks

and does as if he's always right" and "doesn't accept the daily work assignment" without

argument.  Def.'s Ex. 23 at 2.  Wayessa repeated his concerns about Arero's behavior to

Belachew in August.  Def.'s Ex. 25.  Acting Chief Belachew forwarded Wayessa's email to her

own supervisor, Director Mengesha.  *Id.* at 2; Pl.'s Resp. to DSMF ¶¶ 42, 46; Def.'s Ex. 28 at 3,

ECF No. 72-29.  Mengesha, in turn, relayed Wayessa's concerns to Human Resource specialist

4

Yoko Hoffman.  Def.'s Ex. 28 at 2–3.  Hoffman asked Mengesha whether he was considering terminating Arero; Mengesha responded that he wished to give Arero "a letter reprimand with strong warning."  *Id.* at 2.  Soon after, Hoffman told Wayessa that because management's concerns about Arero's behavior had not been documented, management would address the situation with an "informal warning memo."  Ex. 27 at 2; Pl.'s Resp. to DSMF ¶ 53.

Mengesha himself raised the second set of concerns about Arero's performance in late October.  After reviewing a series of broadcasts that occurred several months earlier, Mengesha concluded that Arero and Wayessa had "systematically violated" "VOA Charter and Best practice" by producing biased and inadequately sourced reports.  Def.'s Ex. 40 at 2, ECF No. 72-41; Pl.'s Resp. to DSMF ¶¶ 68, 69.  From June 30 to July 10, the Horn of Africa Service extensively covered the assassination of Hachalu Hundessa—a musician and Oromo rights activist.  Pl.'s Resp. to DSMF ¶ 54; Def.'s Opp'n to FSMF ¶ 205.  Hundessa's death caused civil unrest in Ethiopia and inflamed ethnic tensions.  Def.'s Opp'n to FSMF ¶ 204; Mengesha Dep. at 319:10–321:20.  Arero participated in the Service's coverage of the events as an emcee; he introduced stories and summarized the day's lineup.  Def.'s Opp'n to FSMF ¶ 208; Pl.'s Ex. 77 ("Arero Decl.") ¶ 15, ECF No. 75-1.[3]

---

[3]  Consistent with the Court's ruling at the January 31, 2025, status hearing, the Court has not considered those paragraphs of Arero's declaration that include belatedly disclosed information. *See* Tr. of Jan. 31, 2025 Telephonic Status Hr'g, ECF No. 78.  Arero's declaration included several facts not previously disclosed to the Agency.  Arero Decl. ¶¶ 6–10, 18.  Arero was obligated to supplement his responses to the Agency's interrogatories with that new information "in a timely manner."  Fed. R. Civ. P. 26(e)(1)(A).  He instead waited more than two months after the close of discovery and until the Agency had already filed its motion for summary judgment to file a declaration disclosing that information.  *See* ECF No. 78 at 6:13–25.  Because Arero's delayed disclosure was neither "substantially justified" nor "harmless," the Court has not considered the improperly disclosed paragraphs when deciding this motion.  Fed. R. Civ. P. 37(c)(1); *see, e.g.*, *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 429–430 (D.C. Cir. 2014) (affirming the district court's exclusion of a late-disclosed witness declaration).

The protests after Hundessa's death were a "sensitive topic." Geme Dep. at 38:12–39:3. The arrest of Oromo leaders opposing the Ethiopian government stoked tensions associated with the Amhara group's historical "ethnic domination" against Oromos. Wayessa Dep. 1 at 29:14; *id.* at 29:17–30:15; Def.'s Opp'n to FSMF ¶ 157. Management impressed the need for balanced and careful reporting, and the Service debated how to cover the events. Def.'s Opp'n to FSMF ¶ 215; Geme Dep. at 36:16–37:3. The Agency also received viewer complaints about the coverage, including accusations of pro-government and anti-Oromo bias. Pl.'s Resp. to DSMF ¶ 63; *see, e.g.*, Pl.'s Exs. 84, 85. And protestors claiming that the Amharic language broadcasts were biased against Oromos and the Oromo political opposition to the Ethiopian government assembled outside the VOA's headquarters. Lippman Dep. at 143:8–20.

Several weeks later, Mengesha launched a review of the Amharic and Oromo language programming related to the Hundessa assassination. Mengesha Dep. at 190:7–10. He completed his review by reading English transcripts of the Amharic and Oromo broadcasts for compliance with VOA's standards and practices. Def.'s Ex. 39 at 3, ECF No. 72-40; Pl.'s Resp. to DSMF ¶¶ 65, 66. He then produced a report with his findings. Def.'s Ex. 39. The report criticized both the Oromo and Amharic broadcasts for deviating from the Agency's editorial standards, but it focused on the Oromo broadcasts. *Id.* at 21. Mengesha concluded that the "Oromo coverage was in violation of VOA's Charter, its Best Practice Guide, its editorial practices, and the Agency's code of journalism." *Id.* at 3. In particular, he reported that the Oromo broadcasts failed to uphold the agency's "strict guidelines" requiring "accuracy, balance, fairness and comprehensiveness" because its broadcasts often featured "interviews only with Oromia opposition leaders and sound bites from protestors who oppose the Ethiopian government." *Id.*; *see* Def.'s Opp'n to FSMF ¶ 225. He noted specific problems—particularly inadequate sourcing

and bias—with the reports from the emcee (Arero).  *E.g.*, Def.'s Ex. 39 at 6, 8, 11, 12, 13; *see* Pl.'s Exs. 126, 128, 129 (identifying Arero as the emcee on the relevant days); Mengesha circulated his report to VOA management, Def.'s Ex. 39 at 2, and Hoffman, Def.'s Ex. 40 at 2. He assigned blame for the reporting deficiencies to Wayessa and Arero.  *Id.*

The final documented complaint about Arero's work occurred while the Hundessa broadcast review was ongoing.  In early October 2020, Arero submitted a draft story about opposition to the Ethiopian prime minister for English publication in VOA's Central News Service.  Pl.'s Resp. to DSMF ¶ 78; *see* Pl.'s Ex. 88 at 2–4, ECF No. 75-1 (revised article draft). The editor who received Arero's article shared it with Belachew, flagging "one prominent issue": "There's little if any comment from [the prime minister of Ethiopia] or his administration." Def.'s Ex. 44 at 3.  Belachew followed up with Arero.  *Id.*  She commended Arero for wanting to publish in English but criticized the story as "totally one-sided."  *Id.*  Belachew separately shared the story with Mengesha.  Def.'s Ex. 49 at 2, ECF No. 72-50.  Mengesha responded, "I think he is losing it.  He is determined to give VOA platform to the Oromo activists.  He has done enough damage and he needs to be controlled."  *Id.*  Mengesha told the English language editor to disregard the story.  Def.'s Ex. 50 at 1, ECF No. 72-51.  He also sent the story to Hoffman and management, with whom he had been discussing the Hundessa broadcasts.  His email identified Arero as "one of the worst violators of VOA's editorial guidelines" and cited the story as an example of "how this guy operates."  Def.'s Ex. 51 at 2, ECF No. 72-52.  For his part, Arero told both Belachew that the story was still in the draft phase and that he had decided to drop it because he could not get "all the sides" he wanted in it.  Def.'s Ex. 48 at 2–3, ECF No. 72-49.

A few weeks later, management was still discussing how to respond to the reporting deficiencies Mengesha had identified in the Oromo language Hundessa broadcasts.  Def.'s Ex.

41 at 2–4, ECF No. 72-42.  Mengesha told the acting director of Programming, John Lippman, and the HR director, David Kotz, that Arero was a "headache who doesn't follow instructions," stated that "[h]e totally gave the show consciously to the opposition."  *Id.* at 2.

Ultimately, Mengesha decided to terminate Arero in early January.  Def.'s Ex. 55 at 2, ECF No. 72-56.[4]  Arero's termination letter stated:  "During your probationary period, you have produced reports which do not meet applicable VOA standards and question your abilities as a VOA journalist."  Def.'s Ex. 15 at 2–3, ECF No. 72-16.

Arero immediately filed an Equal Employment Opportunity complaint with the Agency's Office of Civil Rights.  Def.'s Ex. 64, ECF No. 72-65.  When that failed, he appealed to the Equal Employment Opportunity Commission.  *See* Def.'s Ex. 68, ECF No. 72-69; Ex. 69, ECF No. 72-70.  The EEOC affirmed the Agency's finding that Arero had failed to prove discrimination.  Ex. 69 at 4; *see* Def.'s Ex. 70, ECF No. 72-71 (denying Arero's motion for reconsideration).  Arero then filed this lawsuit, alleging discriminatory treatment based on ethnicity, retaliation for engaging in protected activity, and a hostile work environment—all under Title VII.  Am. Compl. ¶¶ 87–102.  He maintains that the Agency—particularly Belachew and Mengesha—discriminate against Oromos and the Oromo service in favor of the Amharic service.  *See, e.g.*, Pl.'s Opp'n at 22–23.  In a prior order, this Court denied the Agency's motion to dismiss Arero's Complaint.  ECF No. 36.  The Agency now moves for summary judgment. The motion is ripe.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this suit arises under Title VII.

---

[4]  The Agency argues that other Agency management joined in the decision to terminate Arero. *See, e.g.*, Def.'s Reply in Supp. of Stat. of Mat. Facts ¶ 92, ECF No. 77-1; Def.'s Reply to Opp'n to Summ. J. at 6, ECF No. 77.  The record shows that Mengesha made the final decision to terminate Arero, though he discussed that decision with other members of management.  Def.'s Ex. 55 at 2; Mengesha Dep. at 239:6–20.

## II.

To prevail at summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party has the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once it has met this burden, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up); *see* Fed. R. Civ. P. 56(c)(1). At summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn" in his favor. *Anderson*, 477 U.S. at 255. But the nonmoving party "may not rest upon mere allegation or denials of his pleading." *Id.* at 248 (cleaned up). He "must present affirmative evidence" "that would permit a reasonable jury to find in his favor." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241, 1242 (D.C. Cir. 1987) (cleaned up). The Court takes each of Arero's three claims in turn.

## III.

Arero claims that the Agency discriminated against him because of his Oromo ethnicity in violation of Title VII. Am. Compl. ¶¶ 87–93. Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against its employees based on, among other characteristics, an employee's national origin. 42 U.S.C. § 2000e-2(a).

As the parties agree, the *McDonnell Douglas* burden-shifting framework governs Arero's discrimination claim. *See* Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 7, ECF No. 72; Pl.'s Opp'n at 14; *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the "the plaintiff bears the 'initial burden' of 'establishing a prima facie case' by producing enough evidence to support an inference of discriminatory motive." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025). "To state a prima facie case of discrimination, a plaintiff must allege she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

"If the plaintiff clears that hurdle, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *Ames*, 605 U.S. at 308–309 (cleaned up). At that point, the employer must produce evidence sufficient to "raise a triable issue of fact as to intentional discrimination and to provide the employee with a full and fair opportunity for rebuttal." *Figueroa v. Pompeo*, 923 F.3d 1078, 1092 (D.C. Cir. 2019). If the employer meets that burden, "the burden then shifts back to the employee, who must prove that, despite the proffered reason, she has been the victim of intentional discrimination." *Id.* at 1086 (cleaned up).

In this circuit, however, "once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (cleaned up). At that point, a court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* at 494 (emphasis in original).

Arero's Complaint identifies two adverse employment actions: The Agency's failure to promote him to full-time employment status for more than a decade and his January 2021 termination. Am. Compl. ¶¶ 89, 90. The Court addresses the failure-to-promote theory before turning to Arero's claim based on his termination.

## A.

To prevail on a discrimination claim based on failure to promote, Arero must show: "(1) []he is a member of a protected class; (2) []he applied for and was qualified for an available position; (3) despite [his] qualifications, []he was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

Arero cannot make that showing because there is no genuine dispute that Arero received the first open position for a full-time Oromo reporter for which he applied. *See* Def.'s Ex. 10 ¶¶ 5–6, ECF No. 72-11. True, Arero's evidence shows that he previously informally requested promotion to full-time status and had been told that no such position was available. *See* Pl.'s Resp. to DSMF ¶¶ 16–17; Def.'s Ex. 71 at 15, ECF No. 72-72. But that does not rebut the Agency's evidence that Arero never applied for such a position. *See, e.g.*, *Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003) (holding that the plaintiff's "allegation that [the agency] violated Title VII by not promoting her to the GS-14 position is defeated by her failure to apply for that position"); *Chambers v. Sebelius*, 6 F. Supp. 3d 118, 127 (D.D.C. 2013) ("In addressing failure to promote claims in employment discrimination cases, courts in this Circuit have focused on the need for showing an available position for which promotion was denied"), *aff'd sub nom. Chambers v. Burwell*, 824 F.3d 141 (D.C. Cir. 2016). Arero himself did not remember applying for another full-time position before the one he received. Def.'s Reply to DSMF ¶ 16, ECF No.

77-1 (citing Arero Dep. at 68:9–69:11). And Arero does not offer any substantive arguments on this point in his brief. Given the lack of evidence supporting a failure-to-promote claim, the Agency is entitled to summary judgment on Arero's discrimination claim to the extent that it is based on his failure to obtain an earlier promotion.

## B.

The Court now turns to Arero's discrimination claim focused on his January 2021 termination. *See* Am. Compl. ¶ 90; Pl.'s Opp'n at 16–31. Because the Agency has asserted a nondiscriminatory justification for terminating Arero, the Court will not consider whether Arero made out a prima facie case of discrimination. *See Brady*, 520 F.3d at 494. The Court concludes that the Agency has supplied a legitimate, nondiscriminatory reason for Arero's termination— that his reporting failed to meet the Agency's standards. The Court further concludes that Arero has failed to show that reason is pretext for illicit discrimination.

## 1.

At the second step of *McDonnell Douglas*, the employer must "articulate a legitimate, nondiscriminatory reason for its action." *Figueroa*, 923 F.3d at 1087. The D.C. Circuit has identified four factors that should be "paramount" in determining whether the employer has met this burden: (1) the employer "must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding)," (2) "the factfinder, if it believed the evidence, must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason," (3) "the reason must be facially credible in light of the proffered evidence," and (4) "the evidence must present a clear and reasonably specific explanation." *Id.* at 1087–1088 (cleaned up). The Agency's explanation that it terminated Arero because he produced reports that did not meet the Agency's standards satisfies these requirements. Def.'s Mot. at 8; *see* Def.'s Ex. 15 at 2–3.

12

First, the Agency proffered ample evidence to support its decision.  *See* Def.'s Mot. 8–12 (summarizing evidence).  There can be no serious dispute that the record documents two incidents of Arero's inadequate reporting in 2020.  Indeed, although Arero disputes the Agency's termination decision, he does not contest the validity of the emails and testimony the Agency offers as evidence of its decision.  *See, e.g.*, Pl.'s Resp. to DSMF ¶¶ 76, 81, 82, 86, 87, 92.

Arero does dispute the accuracy of the English translations of the Oromo language Hundessa broadcasts that Mengesha reviewed as part of his decision to terminate Arero.  Pl.'s Resp. to DSMF ¶¶ 55–62.  But he offers no alternative translations of the transcripts.  He instead points to testimony from VOA Standards Editor, Steven Springer, that there were some inaccuracies in the English translation.  Def.'s Ex. 76 ("Springer Dep.") at 143:3–14, ECF No. 72-77; *see id.* at 211:7–9.  But in that same testimony, Springer clarified that for purposes of determining "whether or not the specific facts, that are being presented by the reporter, whether those facts are clouded with, again, editorial commentary . . . it doesn't really matter whether or not the wording is a hundred percent correct in English, it is knowing what's being described by those – by those translations."  *Id.* at 143:17–144:4.  And Mengesha testified that he relied on the English language translation to make his judgment.  Mengesha Dep. at 144:16–145:11.  These facts are important because the operative question is whether the Agency "honestly believes" that Arero was fired because of deficiencies in his reporting, not whether the Agency was ultimately correct that Arero's reporting violated the Agency's standards.  *Fishbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C Cir. 1996) (citation omitted).  The Court addresses the separate argument that Mengesha's review process was so flawed it demonstrated pretext below.

Second, a factfinder could find that the Agency fired Arero for the nondiscriminatory reason that he produced inaccurately sourced and biased reporting that fell short of the Agency's

journalistic standards.  Arero served as an emcee for the Oromo language service broadcasts

covering Hundessa's assassination and its aftermath in summer 2020.  *See, e.g.*, Arero Decl.

¶ 17.  Mengesha found that the broadcasts, including the emcee portions, violated the Agency's

standards because the stories were "one-sided" and inaccurately sourced.  Mengesha Dep. at

144:1–10, 238:2–5; *see* Def.'s Ex. 39.  Several weeks later, Arero produced another story

Belachew and Mengesha found "one-sided" and out of step with the VOA's "guidance for

fairness and balance."  Def.'s Ex. 47 at 2, ECF No. 72-48; *see* Def.'s Ex. 50 at 2.  All of this

happened while Arero was on his one-year probationary period, the purpose of which was to

evaluate his fitness for the position.  Pl.'s Resp. to DSMF ¶¶ 101–102.  Other evidence

documents that Mengesha discussed how to respond to Arero's "repeated biased reporting" in

the following months with HR and management, and he ultimately decided termination was

appropriate.  Def.'s Ex. 54 at 2, ECF No. 72-55; *see, e.g.*, Def.'s Ex. 55 at 2; Mengesha Dep. at

239:6–18.  Finally, the Agency offers testimony and Arero's termination letter—both of which

corroborate the Agency's story that it fired Arero for producing reports that did not adhere to the

Agency's editorial standards.  *See, e.g.*, Mengesha Dep. at 237:8–14, 240:5–14; Def.'s Ex. 15 at

2–3.  If a factfinder believes this evidence, it could find that the Agency fired Arero for a

legitimate, nondiscriminatory reason:  "dissatisfaction with [Arero's] performance."  *Hogan v.*

*Hayden*, 406 F. Supp. 3d 32, 44 (D.D.C. 2019).

Third, for essentially the same reasons as the second factor, the Agency's explanation for

its decision is "facially credible in light of the proffered evidence."  *Figueroa*, 923 F.3d at 1088

(cleaned up).  Arero focuses his arguments on this factor.  *See* Pl.'s Opp'n at 16–20.  Although

Arero identifies several flaws in Mengesha's decision-making process, those flaws do not show

that the Agency's position that it fired Arero because of unsatisfactory reporting is based "on an

*utterly implausible* account of the evidence." *Bishopp v. District of Columbia*, 788 F.2d 781, 786 (D.C. Cir. 1986) (emphasis added).

Arero tries to identify a slew of issues with the Agency's position that it terminated him for inadequate reporting during the Hundessa broadcasts: (1) Wayessa received less severe discipline than Arero, contrary to HR's recommendation; (2) the Agency never corrected or retracted the Hundessa broadcasts; (3) the Agency delayed firing Arero for several months after the broadcasts, during which Arero continued to perform his job; (4) editors approved the Hundessa broadcast scripts, and (5) Belachew and Springer testified that they did not believe Arero deserved to be fired over the Hundessa broadcasts alone. Pl.'s Opp'n at 19–20. The record contains explanations for most of these purported flaws. Arero received a more severe penalty than Wayessa because Arero was in his probationary period. Mengesha Dep. at 253:17–255:5; *cf. George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (acknowledging that "probationary employees and permanent employees are not similarly situated" for purposes of determining whether an employer's reason for an adverse action was pretextual); *Holbrook v. Reno*, 196 F.3d 255, 262 (D.C. Cir. 1999) (same). It is true that Arero was not fired until several months after the Hundessa reports, but the record shows that Mengesha took time to review the reports and discuss his findings with HR and management. *See, e.g.*, Def.'s Ex. 39 at 2; Def.'s Ex. 54 at 2; Pl.'s Resp. to DSMF ¶ 97. During that time, Arero produced another report Mengesha found inadequate, *see* Def.'s Ex. 49 at 2, adding context to Belachew's and Springer's statements that they would not necessarily have fired Arero for his role in the Hundessa reports alone, had they been the final decisionmakers, *see* Def.'s Opp'n to FSMF ¶¶ 279–280.

Arero *has* identified a genuine dispute over whether someone else approved the scripts he read during the Hundessa broadcast. *Compare, e.g.*, Belachew Dep. at 217:17–218:12 (Arero

wrote his own scripts and performed them live) *with* Arero Decl. ¶¶ 15–16 (Arero did not write his own scripts and those scripts had been approved through the "editorial process"); Wayessa Dep. at 178:12–20 (describing the Agency's typical review process for reporters' scripts, including review by an editor). But that does not render the Agency's justification implausible. Even crediting Arero's position that he used approved scripts written by someone else, other evidence indicates that Arero went off script on air. Wayessa Dep. 1 at 93:16–94:20. And, most importantly, the evidence shows that Mengesha believed that Arero (along with Wayessa) was responsible for failing to properly "source" and "balance" the Hundessa broadcasts. Mengesha Dep. at 238:2–5; *see, e.g.*, Def.'s Ex. 41 at 2. More, the Hundessa reporting is not the only incident of Arero's inadequate performance.

Arero also challenges the Agency's second example of his inadequate reporting—the draft story he submitted to Central News for English publication. Def.'s Ex. 51 at 2–6. Arero says the Agency's reliance on this incident is not facially credible because the Agency elsewhere stated that he was fired solely for his role in the Hundessa broadcasts. *See* Pl.'s Opp'n at 16–18. True, Mengesha testified that the inadequate reports referenced in the termination letter referred to the Hundessa broadcasts and the Agency candidly admits that Arero's "Hundessa broadcasts were the driving factor for [his] termination." Def.'s Opp'n to FSMF ¶ 278; Mengesha Dep. at 236:16–237:7. But other evidence confirms that Mengesha viewed Arero's draft story as part of a pattern of inadequate reporting. *See, e.g.*, Def.'s Ex. 51 at 2; Def.'s Ex. 54 at 2. And, in his EEO materials, Arero himself identified his draft story as an example of his "attempt to file stories that the management doesn't like it [*sic*] covered" that led to his termination. Pl.'s Ex. 79 at 45–46.

Turning to the fourth factor, the Agency no doubt provided a "clear and reasonably specific explanation" for its decision to fire Arero. *Figueroa*, 923 F.3d at 1088 (cleaned up). While Arero's termination letter is written at a high level of generality, Def.'s Ex. 15 at 2–3, the Agency has repeatedly explained that it fired him for biased and inaccurately sourced reporting that fell below the Agency's journalistic standards. Indeed, there can be no doubt from Arero's through briefing and extensive discovery that he has been given "a full and fair opportunity to attack the explanation as pretextual." *Figueroa*, 923 F.3d at 1088 (cleaned up).

To be sure, the Agency raises another reason for its decision to terminate Arero— insubordination. Def.'s Mot. at 8–9. The record documents Wayessa's complaints about Arero's behavior and management's response to the same. *See, e.g.*, Def.'s Ex. 23 at 2; Def.'s Ex. 25 at 2; Def.'s Ex. 41 at 2. Insubordination is a legitimate reason for terminating an employee. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008). But, as Arero points out, evidence in the record calls into doubt whether the Agency fired Arero because of his insubordination. Pl.'s Opp'n at 16–17. Arero's termination letter does not refer to Wayessa's complaints or otherwise mention behavioral problems. Def.'s Ex. 15 at 2–3. Of course, the Agency was not required to list every reason for Arero's firing in that letter because of his probationary status. *See* Def.'s Reply to Opp'n to Mot. for Summ. J. ("Reply") at 6, ECF No. 77 (citing 5 C.F.R. § 315.804(a)). And some evidence indicates that Arero's behavioral issues played a role in his termination. *See, e.g.*, Def.'s Ex. 61 at 2, ECF No. 72-62. Mengesha testified, however, that Arero was fired for biased and unbalanced reporting, while specifically denying that any other issues led to the termination. Mengesha Dep. at 240:2–241:11. Arero has identified a genuine dispute of fact as to whether he was fired for his behavior and so the Court does not rely on this justification for his termination. That dispute, however, does not take away

from the fact that the Agency satisfied its burden at step two of *McDonnell Douglas* by "articulat[ing] a legitimate, nondiscriminatory reason for its action." *Figueroa*, 923 F.3d at 1087; *cf. Chapman v. AI Transp.*, 229 F.3d 1012, 1037 & n.30 (11th Cir. 2000) (en banc) (plaintiff must rebut *all* of an employer's legitimate, nondiscriminatory reasons for an adverse action).

The Court accepts Arero's claim that Mengesha was the ultimate decisionmaker regarding his firing, *see* Pl.'s Opp'n at 16–17; Mengesha Dep. at 239:6–8, 19–20, and concludes that Mengesha's explanation that he decided to fire Arero because of inadequate and biased reporting meets the requisite standards here.

## 2.

At the third step of the *McDonnell Douglas* framework, a plaintiff "must prove that, despite the proffered reason, []he been the victim of intentional discrimination." *Figueroa*, 923 F.3d at 1086. Arero claims that the Agency—Mengesha and Belachew, in particular—discriminated against him because of his Oromo ethnicity. *See, e.g.*, Pl.'s Opp'n at 1–6; Am. Compl. ¶¶ 87–93. He has "failed to put forward sufficient evidence for a reasonable jury to find" that he was fired because of his Oromo ethnicity. *Brady*, 520 F.3d at 497. The record instead shows that Arero—a probationary employee—was terminated because he produced reports that fell below the Agency's standards.

The Agency's evidence makes a strong showing that Arero was terminated because of his performance, not because of his ethnicity. During the many years Arero worked as a contract reporter for the Oromo service, he received several promotions in contractor status. Pl.'s Resp. to DSMF ¶ 10; Def.'s Ex. 9 at 2, ECF No. 72-10. And Arero was promoted to full-time employment with at least Mengesha's sign-off. Def.'s Ex. 11 at 1, ECF No. 72-12; Lippman

Dep. 160:21–161:6.  Unsurprisingly, given that Oromo staff members are expected to be fluent in Oromo, most Oromo language reporters have been ethnically Oromo.  Pl.'s Resp. to DSMF ¶ 34.  Arero is the only Oromo employee to have been terminated by the Agency since at least 2007.  Pl.'s Resp. to DSMF ¶ 35.

During Arero's probationary period, Mengesha described Arero's reporting on two separate occasions as improperly biased or one-sided.  *See, e.g.*, *id.* ¶¶ 71, 86; Def.'s Exs. 40, 50, 51.  And during that same probationary period, Arero's Oromo-identifying editor lodged complaints about his work.  *E.g.*, Pl.'s Resp. to DSMF ¶¶ 41, 44; Def.'s Ex. 23 at 2.  Belachew— who is Oromo herself and previously worked as a broadcaster for the Oromo language service— also fielded complaints about Arero.  Belachew Dep. at 21:3–6, 22:8–14, 184:8–14, 193:1–11; Def.'s Ex. 25 at 2; Def.'s Ex. 47 at 2.[5]  As covered at length in this opinion, emails document the Agency's decision-making process that led to Mengesha's decision to fire Arero.  Against this backdrop of the well-documented concerns leading up to Arero's termination, the Court considers Arero's three main arguments that his performance "was not the actual reason" for his termination "and that the [Agency] intentionally discriminated against [Arero] based on his [Oromo ethnicity]."  *Brady*, 520 F.3d at 495.

First, Arero argues that the Agency's shifting explanations for its decision, including its invocation of his insubordination as a justification for his termination, demonstrates pretext.  Pl.'s Opp'n at 21.  True, there is a dispute of fact about whether Mengesha decided to fire Arero

---

[5] Arero purports to dispute that Belachew only or primarily identifies as an Oromo because she "testif[ied] that she identifies as 'an Oromo, and [as] an Ethiopian.'"  Pl.'s Resp. to DSMF ¶ 28 (quoting Belachew Dep. at 110:13–15).  This is not a genuine dispute.  *See Steele*, 535 F.3d at 692.  Arero himself identifies as both an Oromo and someone born in Ethiopia.  Am. Compl. ¶ 1.  And the evidence establishes that Belachew is Oromo.  *E.g.*, Pl.'s Resp. to DSMF ¶¶ 28, 32; Belachew Dep. at 16:21–22; 107:16–108:4; 111:20–112:5.

because of his behavioral problems.  *See supra* Section III.B.1.  But there is no genuine dispute of fact that Mengesha raised and reviewed concerns about Arero's behavior.  *See, e.g.*, Def.'s Ex. 41 at 2.  That Mengesha had another concern about Arero—beyond his inadequate reporting— does not mean that the Agency is lying about the legitimate reason it had for terminating an unsatisfactory probationary employee.  And the record evidence of the Agency's treatment of Arero's insubordination cuts against any finding of illicit motive.  The complaints about Arero's behavior primarily came from Wayessa—a fellow Oromo.  Pl.'s Resp. to DSMF ¶ 38.  When HR asked Mengesha whether he wanted to terminate Arero for the behavioral problems, Mengesha opted to give him a reprimand and warning.  Def.'s Ex. 28 at 2.  Ultimately, Arero "has created only a weak issue of material fact as to whether the employer's explanation is untrue" and that is not enough to survive summary judgment considering the "abundant independent evidence in the record that no discrimination has occurred."  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc).

Second, Arero argues that Mengesha's review and Hoffman's investigation into the Hundessa broadcasts shows pretext.  He first criticizes Mengesha's program review on the ground that its subjectivity should raise concerns, Pl.'s Opp'n at 21, and that the review was "inexplicably unfair," Pl.'s Opp'n at 22 (quoting *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006)).  "[C]ourts traditionally treat explanations that rely heavily on subjective considerations with caution" but "[a]n employer's reliance on disputed subjective assessments will not create a jury issue in every employment discrimination case."  *Aka*, 156 F.3d at 1298.  This is one such case.

Arero overstates the degree to which his termination was improperly based on Mengesha's subjectivity.  For example, Arero's charge that Mengesha's review was unfair

because he deviated from Agency policy by conducting his own review of the Hundessa reporting rather than referring it to the program review office, Pl.'s Opp'n at 22, misinterprets the evidence.  The "policy" Arero points to comes from an Agency official's personal view that a division director "should [not] be the final and definitive opinion" on whether content originating from his division is biased, because any content should be "reviewed by someone who has no stake in the matter."  Springer Dep. 87:22–89:2.  But that same official also acknowledged that Mengesha was "certainly entitled to provide [his] opinion."  *Id.* at 88:21–22.  And Mengesha *did* ask other senior managers outside the Africa Division, including Colin Lovett from the program review office, to "read the whole translation and compare it with [his] conclusion" about the Hundessa reporting.  Def.'s Ex. 39 at 2; *see* Mengesha Dep. at 265:17–266:22.

Arero also criticizes as subjective Mengesha's decision to focus on the Oromo service's coverage of the Hundessa broadcasts over the Amharic service's coverage.  Pl.'s Opp'n at 22–23, 29–30.  Supporting that argument is Wayessa's testimony that he felt that Belachew sometimes applied the Agency's guidelines more strictly to the Oromo service than the Amharic service, including during some of the Hundessa broadcasts.  Pl.'s Ex. 103 ("Wayessa Dep. 2") at 303:20–306:21, ECF No. 75-1.  But the evidence does not support an inference that Mengesha unfairly criticized problems in the Oromo reporting while tolerating flaws in the Amharic coverage.  Mengesha documented problems in the Amharic coverage but decided to focus on the Oromo coverage because he found that the Oromo reporting deviated more severely from the Agency's guidelines.  Def.'s Ex. 39 at 21; Mengesha Dep. at 312:1–3; *see also* Def.'s Opp'n to FSMF ¶¶ 225–232.  And "[a]n employer cannot be held liable for simply ma[king] a judgment call on permissible grounds."  *Jeffries v. Barr*, 965 F.3d 843, 863 (D.C. Cir. 2020) (cleaned up).  That is especially so here, where the reporting Mengesha found unacceptable remained available

for other members of management to read and compare to the Agency's published reporting

guidelines.  Def.'s Ex. 39 at 2, 21; *see generally* Def.'s Ex. 2, ECF No. 72-3 (VOA's "Best

Practices Guide").  Indeed, Mengesha encouraged "anyone who has the time" to review both the

Amharic and Oromo coverage to verify his conclusion that the Oromo service had more serious

editorial lapses.  Def.'s Ex. 39 at 21.  Mengesha's reliance on externally verifiable guidelines and

encouraging of other management to review his findings differentiates this case from the sort of

subjective decisionmaking that courts have found suspect.  *See Stoe v. Barr*, 960 F.3d 627, 644

(D.C. Cir. 2020) (finding evidence of pretext in an interview system with a "scoring system that

was easily manipulated"); *Wang v. WMATA*, 206 F. Supp. 3d 46, 71 & 71 n.14 (D.D.C. 2016)

(finding suspect an employer's reliance on a performance evaluation with subjective criticisms

like the employee's "incoherent language," communication difficulties, and lack of initiative).

Arero's final criticism of the Hundessa broadcast review is that HR's investigation

unfairly deviated from standard protocol.  Pl.'s Opp'n at 23–24.  Arero misrepresents much of

Hoffman's testimony about her investigation by portraying her testimony that she could not

remember various aspects of her investigation into Arero as evidence that Hoffman affirmatively

did not comply with her usual process.  *Compare* Pl.'s Opp'n 23–24 *with* Pl.'s Ex. 113

("Hoffman Dep.") at 178:8–180:10, ECF No. 75-1.  Hoffman did acknowledge that she did not

interview Arero because she had "all the supporting documents to show that Mr. Arero produced

a[] . . . biased or one-sided story."  *See* Hoffman Dep. 178:20–180:1.  That goes against her

testimony that she "would give the employee the opportunity to respond to the allegation against

them."  *Id*. at 44:17–20.  But Arero points to no evidence that Hoffman's review was required in

the first instance.  In fact, Hoffman testified that she could only make a recommendation as to

what disciplinary steps should be taken.  *Id.* at 52:16–53:12.

Third, Arero relies heavily on "Mengesha and Belachew's well-documented history of discriminatory attitudes and conduct toward non-Amhara staff" to establish pretext.  Pl.'s Opp'n at 24.  Pretext can be shown by "general treatment of minority employees; or discriminatory statements by the decisionmaker."  *Id.* (quoting *Lapera v. Fed. Nat'l Mortg. Ass'n*, 210 F. Supp. 3d 164, 185 (D.D.C. 2016)).  The problem for Arero is that most of the evidence on which he relies does not support the propositions for which he offers it.

Start with Mengesha.  As evidence of Mengesha's bias, Arero points out that Mengesha "described Oromo individuals as 'ethnic fanatics,' 'Oromo extremists,' the 'opposition,' and 'threat[s]' to his Amharic service journalists."  *See* Pl.'s Opp'n at 24 (alteration in original) (quoting FSMF ¶¶ 219, 224).  Arero's selective quoting entirely distorts Mengesha's testimony. The "full context" of Mengesha's testimony makes clear that he used these words to describe *people protesting outside VOA's building*—protestors he thought unfairly criticized the Agency's reporting and threatened VOA staff members by name.  *Cf. Aka*, 156 F.3d at 1290; Mengesha Dep. at 334:7–336:22.  For example, Mengesha used the terms "ethnic fanatics" and "[e]nemies outside" to refer to the people he feared might kill Belachew's son or his daughter.  Mengesha Dep at 337:1–15.  He explained that he prioritized "protection of the journalist, including Sora [Arero]."  *Id.* at 337:21.  And, finally, Mengesha specifically clarified that his dislike of the protestors was not particular to their ethnicity.  *See id.* at 339:15–19 ("By the way, don't generalize it.  I said there are some [fanatic] elements among the Oromo groups.  There are some elements in the Amharic group also.  There are some elements in Tigray also who really have this fanatic politics.").

The evidence of Belachew's bias is stronger, but still insufficient to create an inference that Arero was terminated for discriminatory reasons.  *See* Pl.'s Opp'n at 26–28.  Arero's focus

on Bleachew encounters two initial problems.  First, according to Arero and the record evidence, Mengesha was the one who made the final decision to terminate Arero.  *Id.* at 16, 17; *see* Mengesha Dep. at 239:6–8, 19–20 (Mengesha's testimony that he made the final termination decision).  Unsurprisingly, Mengesha consulted various officials—including Belachew—about Arero's infractions and how to respond to them.  *See, e.g.*, Mengesha Dep. 239:9–18; Def.'s Ex. 41 at 2–4; Def.'s Ex. 55 at 2.  But Mengesha's prudent practice does not automatically make Belachew's behavior relevant to Arero's termination.  And Arero offers no discernable explanation for why it should be.  *Cf. Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011) (discussing a "cat's paw" theory of liability under which an employer is "liable for the animus of a supervisor who was not charged with making the ultimate employment decision").  In fact, Arero elsewhere distances Belachew from Mengesha's decision by pointing to Belachew's statement that she would "not recommended firing [Arero]" based on the Hundessa broadcasts alone had she been the decisionmaker.  Pl.'s Opp'n at 20.

Second, Belachew herself is Oromo.  *E.g.*, Belachew Dep. at 21:3–5.  And while there is no "conclusive presumption that an employer will not discriminate against members of his own race," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998), "[c]ourts in our district have repeatedly held that a decision-maker's inclusion in the same protected class as the terminated plaintiff cuts against any inference of discrimination," *Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 144 (D.D.C. 2017); *e.g.*, *Onyebuchi v. Howard Univ. Hosp.*, 731 F. Supp. 3d 1, 5–6 (D.D.C. 2024); *see McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 460–461 (5th Cir. 2019) ("[O]n numerous occasions, this court has held that discrimination is less likely when the supervisor is in the same protected class as the plaintiff.").

Arero's best opposing evidence is that Belachew jokingly used an anti-Oromo slur, "galla," against another Oromo reporter. Further Stat. of Mat. Facts ¶¶ 174, 175, ECF No. 74-1; Geme Dep. at 76:21–78:20.[6] Evidence of an "overtly racist statement," even when used jokingly can create a triable issue of pretext when repeated in the plaintiff's presence or when accompanied by other evidence of racism. *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1233, 1237 (D.C. Cir. 1984); *Morris v. McCarthy*, 825 F.3d 658, 669 (D.C. Cir. 2016). But that is not the case here where the single slight was used by a non-decisionmaker of the same protected class, against someone other than the plaintiff, and accompanies very limited circumstantial evidence of discrimination. *Cf. Carter*, 727 F.2d at 1236 (citing *Bundy v. Jackson*, 641 F.2d 934 n.9 (D.C. Cir. 1981)). Other factors also lessen any discriminatory inference that can be drawn from the incident. Belachew apologized and there is no evidence that she repeated the insult. Geme Dep. at 76:21–77:7, 78:10–13.

Other evidence of Belachew's discrimination is limited. There are claims that reporters outside the Amhara service were not invited to some editorial meetings during COVID-19, but the Oromo editor Wayessa testified that he attended each of those meetings and that "[n]obody asked" whether Oromo service reporters could attend the meetings. Def.'s Opp'n to FSMF ¶ 180; Wayessa Dep. 1 at 187:18–189:8. And, although Arero points out that Belachew called him offensive names, no evidence in the record ties those terms to his ethnicity. Def.'s Opp'n to FSMF ¶¶ 171, 172; *see* Mengesha Dep. at 24:16–25:9, 25:13–19.

---

[6] Arero maintains that this slur is an equivalent of the "n-word," but his own expert declined to endorse that comparison. Def.'s Reply Ex. A ("Bariagaber Dep.") at 54:23–55:18, ECF No. 77-3. Arero's position about the severity of the word is further undermined by his use and explanation of the term to describe himself in his Complaint. Am. Compl. ¶ 24 ("Mr. Arero was, however, considered by some Ethiopians to be a 'Galla' (meaning outsider)").

Likewise, the evidence shows that Belachew commented on Arero's accent, but the record does not support Arero's characterization of those comments as discriminatory. Pl.'s Opp'n 26 (citing FSMF ¶¶ 169–170). Instead, as another Oromo reporter testified, the record shows that Belachew found Arero's accent, which is unique to a particular region of Oromia, difficult to understand when he was reporting. Geme Dep. at 133:15–134:8, 136:3–10. These facts distinguish *Iyoha v. Architect of the Capitol*, 927 F.3d 561 (D.C. Cir. 2019). There, the Circuit recognized that accent-based discrimination can sometimes support an inference of national origin discrimination because the two concepts "are often intertwined." *Id.* at 567. But, unlike here, there was no evidence that the Iyoha's accent "made him hard to understand or interfered with his ability to perform employment-related tasks." *Id.* And *Iyoha* specifically left open the possibility that an employer could take legitimate action when an "employee's language skills interfere with their ability to do their job." *Id.* In sum, the record contains evidence that Belachew may have repeatedly insulted and offended her subordinates, but there is insufficient evidence of discrimination based on her poor behavior, especially considering that Belachew was not herself the final decisionmaker. *See Tovihlon v. Allied Aviation, Inc.*, 323 F. Supp. 3d 6, 16–17 (D.D.C. 2018) (evidence that non-decisionmaker used a racial slur against plaintiff did not create a dispute of fact on the issue of discrimination).

Ultimately, to the extent that the record reveals bias on Mengesha's (or Belachew's) part, it reveals a political or ideological bias in favor of the Amhara language and the Ethiopian national government. *See, e.g.*, FSMF ¶¶ 161, 164. Mengesha himself repeatedly described wanting to promote stories that "help bring peace and stability" to Ethiopia. Def.'s Ex. 39 at 6; Mengesha Dep. 331:10–19; *see* Geme Dep. at 117:12–118:7. As for Belachew, the evidence suggests that she promoted the Ahmara language and favored a politically unified Ethiopia.

Geme Dep. at 68:3–69:8, 111:18–113:13; Belachew Dep. at 108:15–19; Arero Decl. ¶ 11.  Some non-Amhara employees felt that Belachew and Mengesha furthered their political views through the stories they promoted and the editorial guidelines they applied.  Def.'s Ex. 74 ("Wayessa Decl.") ¶ 7, ECF No. 72-75; Geme Dep. at 50:12–51:15.  But those same employees disavowed any belief that Belachew or Mengesha were biased against the Oromo service because of ethnicity.  Geme Dep. at 50:12–51:15; Wayessa Decl. ¶ 8; *see* Pl.'s Ex. 102 at 148, ECF No. 75-1 ("It's not about Amharic people, you know . . . It's not only about Amharic people, like it's a government."); Arero Decl. ¶ 14 (Mengesha and Belachew "increasingly push[ed] stories favorable to the Ethiopian government, particularly related to the civil war in Ethiopia's Tigray region, and suppressing stories that they didn't like").  Arero may have run up against his superiors' editorial preference by pushing stories critical of the Ethiopian government.  *See, e.g.*, Def.'s Ex. 49 at 2; Arero Decl. ¶ 14; Pl.'s Ex. 79 at 45, ECF No. 75-1.  But that does not help Arero's discrimination claim.  As the text of Title VII makes clear, political ideology is not a protected ground under Title VII.  42 U.S.C. § 2000e-2(a)(1).  And the Court is especially reluctant to weigh in on the wisdom of the Agency's editorial bent.

* * *

The Agency may not have made a wise choice in terminating Arero.  But employers have great latitude in disciplining their employees.  *See Moini v. Wrighton,* 602 F. Supp. 3d 162, 175 (D.D.C. 2022) (noting that courts do not sit as a "super-personnel department" able to reevaluate the merits of a personnel decision), *aff'd sub. nom., Moini v. Granberg*, 2024 WL 210624 (D.C. Cir. May 1, 2024) (per curiam).  That is especially true for a broadcaster who maintains editorial control over a publication.

**IV.**

The Court next considers Arero's retaliation claim.  Title VII makes it unlawful "for an employer to discriminate against [an employee] . . . because he has opposed any practice made an unlawful employment practice by" Title VII.  42 U.S.C. § 2000e-3(a).  Arero claims that he was fired in retaliation for opposing Belachew's and Mengesha's discriminatory treatment of Oromo reporters.  Am. Compl. ¶¶ 99–102.[7]

To begin, the Agency argues that summary judgment is warranted because Arero failed to exhaust his retaliation claim—a prerequisite to bringing that claim in federal court.  Def.'s Mot. at 22–25; *see Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012).  The Court once again rejects this argument.  *See* ECF No. 36 at 4.  Arero's administrative complaint did not specifically use the word "retaliation," but he was not required to do so.  *See, e.g.*, *Brokenborough v. D.C.*, 236 F. Supp. 3d 41, 50–51 (D.D.C. 2017).  Arero shared that he had been fired and noted that Oromo employees complained about discrimination.  Def.'s Ex. 64 at 9.  Arero's claim that he was fired in retaliation for complaining about that discrimination is "reasonably related to" the discrimination Arero discussed in his administrative complaint. *Webster v. Del Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022).

Turning to the merits of the retaliation claim, the Court concludes that the Agency is entitled to summary judgment.  To state a prima facie case of retaliation, a plaintiff must show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones*, 557 F.3d at 677. Like Title VII discrimination claims, Title VII retaliation claims are subject to the *McDonnell*

---

[7]  To the extent that Arero's retaliation claim turns the Agency's failure to promote him, *see* Am. Compl. ¶ 101, it fails for the same reason a discrimination claim premised on such conduct fails, *see supra* Section III.A.

*Douglas* burden shifting framework.  *See, e.g.*, *Durant* v. *D.C. Gov't*, 875 F.3d 685, 696–697 (D.C. Cir. 2017).

Because the Agency asserted a legitimate, nonretaliatory reason for terminating Arero, *see supra* Section III.B.1, the Court "proceed[s] to the ultimate question of retaliation *vel non*." *Jones*, 557 F.3d at 678.  At this stage, the Court "reviews each of the three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they either separately or in combination provide sufficient evidence for a reasonable jury to infer retaliation." *Id.* at 679 (cleaned up).  Arero's evidence of pretext is just as insufficient for his retaliation claim as for his discrimination claim.  *See supra* Section III.B.2.

Arero's retaliation claim also suffers from another problem:  The record does not permit an inference of retaliation because there is insufficient evidence from which a jury could find that a "causal link connects" his termination to protected activity.  *Jones*, 557 F.3d at 678.  Arero maintains that he "actively opposed Mengesha and Belachew's discriminatory practices," but he has made a weak showing on this point.  Pl.'s Opp'n at 6 (citing FSMF ¶ 194).  When asked about how he opposed discrimination in interrogatories and in his deposition, Arero provided little detail about what steps he took or when.  Instead, he broadly maintained that he complained about discrimination against the Oromo service during most or all of his time affiliated with the Agency.  *See, e.g.*, Arero Dep. at 82:22–25; Def.'s Ex. 71 at 14.  That cannot by itself create a material dispute of fact.  Although a party can create a dispute of fact at summary judgment through self-serving testimony, *see* Pl.'s Opp'n at 35 n.12, that does not displace the general rule that "Courts may grant summary judgment to a defendant where a plaintiff's evidence is vague or conclusory," *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016).

Aside from that general testimony, Arero points to three specific incidents of prior protected activity. In his EEO materials, Arero recalled that he met with Mengesha in 2011 and expressed concern about Belachew's promotion to managing editor because of "her attitude towards employees Afaan Oromo and Tigrinya at the editorial meeting." Pl.'s Ex. 79 at 37–38. Arero points to two incidents that occurred after his promotion. He maintains that he shared general concerns about Belachew's and Mengesha's treatment of Oromo employees during a November 2021 interview with HR representative Hoffman. Def.'s Ex. 71 at 14; *cf. Johnson*, 823 F.3d at 710. The only incident about which Arero offers any detail occurred in October 2020, when Arero met with "VOA's then-acting director, Mr. Elez Biberaj, to raise the discriminatory conduct of Mr. Mengesha and Ms. Belachew." Def.'s Ex. 71 at 14; *see* Pl.'s Opp'n at 6, 32–33; Arero Decl. ¶¶ 21, 22.

The record does not support a finding that Arero was terminated because of any of these acts. Arero cannot rely on protected activity predating his promotion because there is no direct evidence that he was terminated for these actions and they occurred too long before his termination for Arero to rely on proximity alone. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–274 (2001). Arero's meetings with Biberaj and Hoffman are, at least, temporally closer to his termination. But no evidence indicates that Belachew, let alone Mengesha, was aware of his complaints to Biberaj or Hoffman. To the contrary, Mengesha and Belachew both stated that they were unaware that Arero had engaged in any protected activity. Def.'s Ex. 73 ¶ 3, ECF No. 72-74; Ex. 72 ¶ 3, ECF No. 72-73. Arero counters by pointing out that Belachew and Mengesha received an email from Biberaj after the October meeting, but that email at most indicates that Arero attended the meeting, not that Arero (or anyone else) engaged in protected activity. Pl.'s Ex. 99 at 118–119, ECF No. 75-1.

Together with Arero's failure to overcome the Agency's legitimate reason for terminating him, the weak record evidence establishing that Arero engaged in prior protected activity or that Mengesha (or Belachew) knew about that activity justifies granting summary judgment for the Agency on Arero's retaliation claim.

**V.**

Finally, the Court arrives at Arero's hostile work environment claim.  Arero claims that he suffered hostile work environment based on his Oromo ethnicity.  Am. Compl. ¶¶ 94–98.  The caselaw sets a high bar for prevailing on a hostile work environment claim.  Arero has not met that bar.

Before turning to the merits of Arero's claim, the Court acknowledges the Agency's renewed argument that Arero failed to administratively exhaust his hostile work environment claim.  Def.'s Mot. at 36–37.  The Court rejects this argument for the same reasons as before. *See* ECF No. 36 at 3–4.  Arero's administrative charge did not use the words "hostile work environment," but he levied many factual allegations that suggested a hostile work environment. *See id.*; Def.'s Ex. 64 at 8–9.  Those allegations provided "sufficient information to put the agency on notice of [Arero's hostile work environment] claim and to enable the agency to investigate it." *Crawford v. Duke*, 867 F.3d 103, 109 (D.C. Cir. 2017) (cleaned up).

To prevail on the merits of his hostile work environment claim, Arero "must first show that he . . . was subjected to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Ayissi-Etoh v. Fannie* Mae, 712 F.3d 572, 577 (D.C. Cir. 2013) (cleaned up). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris*, 510 U.S. at 23.  These circumstances include "the frequency of the

discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. This is a difficult claim to successfully advance, to prevent Title VII from becoming a general civility code. *Arnoldi v. Bd. of Trustees, Nat'l Gallery of Art*, 557 F. Supp. 3d 105, 120 (D.D.C. 2021), *aff'd,* 2022 WL 625721 (D.C. Cir. Mar. 1, 2022) (per curiam).

The record does not show that the Horn of Africa Service was an "extreme" work environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998). Arero relies on much of the same evidence he offers in support of his discrimination and retaliation claims—mainly, Belachew's use of offensive language and Mengesha's and Belachew's "preferential treatment of the Amharic service." Pl.'s Opp'n 35–39. This evidence comes up short for several reasons.

First, many of these incidents have no connection to Arero's protected status—his Oromo ethnicity. For reasons already discussed, the record does not give rise to a triable issue of fact as to whether Mengesha and Belachew discriminated against Oromo reporters because of their Oromo ethnicity. *See supra* Section III.B.2. Arero's reliance on Belachew's insults provides no additional help. "[N]one of the comments . . . directed at [*Arero*] expressly focused on his [ethnicity.]" *Baloch*, 550 F.3d at 1201. Belachew called Arero "t'emama" and "shewrara"— offensive Amharic words unconnected to ethnicity. Def.'s Opp'n to FSMF ¶¶ 171, 172; *see* Mengesha Dep. at 24:14–25:9, 25:19–26:19. In fact, Belachew apparently used the terms to refer to Arero's physical appearance. *See* Arero Decl. ¶ 5; Def.'s Ex. 67 at 2, ECF No. 72-68. Belachew's insensitive comment about the provenance of Arero's child similarly has no connection to Arero's ethnicity. FSMF ¶ 173. The lack of evidence connecting Belachew's behavior to Arero's protected status undermines his hostile work claim. *See Daniel v. Johns Hopkins Univ.*, 118 F. Supp. 3d 312, 320 (D.D.C. 2015).

Second, considered holistically, the incidents on which he relies do not meet the "sufficiently severe or pervasive" standard. *Harris*, 510 U.S. at 21. Belachew's comments, while inappropriate, are more like "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" that are "filter[ed] out" by the high hostile work environment standard. *Faragher*, 524 U.S. at 788 (citation omitted). Arero points to caselaw suggesting that a single "deeply offensive racial epithet" may well be enough to "establish a hostile work environment," *Ayissi-Etoh*, 712 F.3d at 577, but "such a case would involve highly objectionable racial epithets that are absent here," *Montgomery v. McDonough*, 682 F. Supp. 3d 1, 12 (D.D.C. 2023) (an employer's use of the word "ghetto" could not show "discrimination or a hostile work environment based on race or color").

The record does not support Arero's attempts to equate Belachew's use of the word "galla" with an employer's use of a highly offensive slur, like the n-word. Pl.'s Opp'n at 36; *see, e.g.*, Bariagaber Dep. at 55:15–55:18 (plaintiff's expert refusing to endorse the comparison between "galla" and the "n-word"). Even if Arero had provided more evidence about the severity of the term "galla," *Ayissi-Etoh* would still be inapt because there is no evidence that Belachew used the slur against Arero. 712 F.3d at 577; *see Harris*, 510 U.S. at 21 (The "mere utterance of an . . . epithet which engenders offensive feelings in a employee, does not sufficiently affect the conditions of employment to implicate Title VII." (cleaned up)).

And although Arero broadly maintains that he and his coworkers endured Belachew's offensive jibes for years, his vague assertions in declarations are the only evidence that these remarks occurred more often than the sporadic incidents already described. *E.g.*, FSMF ¶ 182, Def.'s Ex. 71 at 9–10. That evidentiary gap is particularly notable because Arero's hostile work

environment claim relies on Belachew's purportedly hostile behavior during more than a decade. *See* Pl.'s Opp'n at 39–41. Arero's inability to identify any other specific incidents in support of his hostile work environment claim during his deposition further cuts against a finding that Belachew's actions were severe or pervasive enough. Arero Dep. at 181:23–182:6; *see Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 229 (D.D.C. 2015); *Johnson*, 823 F.3d at 710.

Arero's evidence about Mengesha's and Belachew's apparent favoritism of the Amharic service does not help his claim. Arero points to some evidence that Oromo reporters felt that the Agency applied its editorial guidelines more strictly to the Oromo service than the Amhara service. Pl.'s Opp'n at 38 (citing FSMF ¶ 188). But the "selective enforcement" of workplace policies "does not necessarily indicate conduct giving rise to a hostile work environment claim." *Brooks v. Grundmann*, 748 F.3d 1273, 1276–1277 (D.C. Cir. 2014). Arero offers *Abdelkarim v. Tomlinson*, but the differences between the evidence of the "on-going pattern of hostility towards [plaintiffs'] national origin, culture, and background" in *Abdelkarim* and the record here underscore why summary judgment is appropriate. 605 F. Supp. 2d 116, 122 (D.D.C. 2009). In *Abdelkarim*, evidence showed that VOA's Arabic Branch discriminated against Egyptians within the Arabic service, including by "repeatedly denigrat[ing] the Egyptian dialect" and "ridicul[ing] Egyptian cultural icons on a daily basis." *Id.* The Director also vowed to "clean the Arabic Branch of Egyptians." *Id.* Any problems with Arero's workplace were less severe in every possible respect. As already discussed, the Agency treated different language services differently and had a legitimate basis for doing so—Amhara is the working language of the Ethiopian government. *See, e.g.*, Mengesha Dep. at 50:13–16; Pl.'s Ex. 114 at 215, ECF No. 75-1. Furthermore, the fact that Arero was promoted during the period of alleged hostility cuts

against any finding that the hostility was so severe as to "alter the conditions of his employment." *Harris*, 510 U.S. at 21.

Ultimately, the record contains evidence that Belachew was far from a perfect boss and that the Horn of Africa Service may not have been a model workplace. But "[b]osses may be harsh, unfair and rude," without violating Title VII. *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012). The totality of the circumstances presented in this record does not rise to the level necessary to support a hostile work environment claim.

## VI.

Arero's termination so soon after he received his long-awaited promotion to full-time employee status is undeniably unfortunate. But this Court is neither a journalistic review board nor a super HR department. The Agency has the expertise and latitude to review and discipline journalists it finds to be underperforming. Arero has not "produced sufficient evidence for a reasonable jury to find that the [Agency's] asserted non-discriminatory reason was not the actual reason" and that the Agency instead intentionally discriminated or retaliated against him because of his Oromo ethnicity. *Brady*, 520 F.3d at 494. Nor has he shown that the conditions of his former workplace were so severe as to amount to a hostile work environment.[8]

For all these reasons, the Agency's Motion for Summary Judgment will be granted. A separate Order will issue today.

Dated: September 16, 2025                              TREVOR N. McFADDEN, U.S.D.J.

---

[8] The Court denies Arero's request for oral argument on the Agency's motion because argument is unnecessary. *See* LCvR 7(f).